**DSND SUBSEA AS, Plaintiff,**

v.

**OCEANOGRAFIA, S.A. DE CV, Defendant.**

**No. 07 Civ. 576 (RJS).**

United States District Court, S.D. New York.

July 29, 2008.

Peter J. Gutowski, Esq, Gina M. Venezia, Esq., and Pamela Schultz, Esq., Free-

hill Hogan & Mahar, LLP, New York, NY, for Plaintiff.

Martin F. Casey, Esq., and Christopher Schierloh, Esq., Casey & Barnett, LLC, New York, NY, and Alfred J. Rufty III, Esq., Harris & Rafty LLC, New Orleans, LA, for Defendant.

## MEMORANDUM AND ORDER

RICHARD J. SULLIVAN, District Judge:

Defendant Oceanografia S.A. de CV. ("Oceanografia") moves to vacate this Court's January 25, 2007 order of maritime attachment and garnishment (the "Attachment Order"). In the alternative, Oceanografia seeks countersecurity from plaintiff DSND Subsea AS ("DSND") in connection with Oceanografia's counterclaim in this action. DSND cross-moves for an order satisfying an English High Court judgment in favor of plaintiff from the funds currently under attachment. For the reasons that follow, defendant's motions to vacate the attachment and for countersecurity are denied. Plaintiff's motion for an award of costs in satisfaction of the English High Court judgment against the funds under attachment is granted.

### I. BACKGROUND

This action arises out of two maritime charter parties between DSND and Oceanografia. Specifically, DSND alleges that in 2001, it was the owner of two vessels, the *MSV Botnica* and the *MSV Fennica.* (Compl. ¶¶ 4, 9.) DSND further alleges that in 2001, it entered into two charter parties pursuant to which Oceanografia agreed to charter each of the two vessels for an agreed-upon fee. (*Id.* ¶¶ 4–5, 9–10.) DSND asserts that the *Botnica* and the *Fennica* were delivered to Oceanografia for service under the charter parties on October 9, 2001, and June 6, 2001, respectively, and that they were returned to DSND on December 21, 2001, and December 23, 2001, respectively. (*Id.* ¶¶ 6–7, 11–12.) DSND claims that Oceanografia still owes it $286,255.47 on the *Botnica* charter party, and $2,956,205.95 on the *Fennica* charter party. (*Id.* ¶¶ 8, 13.)

DSND commenced arbitration proceedings in London in 2002 pursuant to an arbitration clause contained in both charter parties. (*See* Declaration of Michael Stockwood in Opposition to Motion to Vacate Attachment and for Countersecurity ("Stockwood Decl.") ¶¶ 14–16.) Oceanografia contested the application of the arbitration clause, arguing that it did not sign the *Botnica* charter party, and thus was not subject to jurisdiction by the arbitration tribunal in London (the "Tribunal"). (*See id.* ¶¶ 18–20.) The Tribunal ultimately determined in 2004 that the *Botnica* charter was valid and binding on both parties, as was the arbitration clause, and that the Tribunal thus had jurisdiction to hear the substantive claims of the parties. (*See id.* ¶ 28 & Ex. C.) Oceanografia subsequently appealed that decision to the English High Court, which affirmed the decision of the Tribunal on June 12, 2006. (*See id.* ¶¶ 29–31 & Ex. D.) Thereafter, Oceanografia petitioned the High Court for leave to appeal the High Court's decision, which was subsequently denied. (*See id.* ¶ 33.)

As part of its order on June 12, 2006, the High Court issued an award of costs against Oceanografia in connection with the appeal, which DSND alleges Oceanografia has not paid. (*See id.* ¶ 35 & Ex. D.) The Tribunal also issued an award of costs in connection with the litigation of the jurisdictional issue on June 18, 2007, which has also not been paid.[1] (*See id.* ¶ 35.)

---

1. Defendant represents, and plaintiff does not dispute, that the arbitration in London is now

On or about January 25, 2007, following the resolution of the jurisdictional issue, DSND filed a verified complaint and an *ex parte* application for the issuance of an order of maritime attachment in this District "to obtain security in favor of plaintiff in respect to its claim against [defendant]" for breach of the charter parties in the amount of $5,355,398.42. (Verified Compl. ¶¶ 1, 17.) On the same day, the Honorable Kenneth M. Karas, District Judge, to whom this case was previously assigned, granted that application pursuant to Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims ("Supplemental Rules").[2] The Attachment Order provided that "service on any garnishee herein is deemed to be effective and continuous service throughout the remainder of the day upon which such service is made" (hereinafter referred to as the "continuous service provision"). (*See* January 25, 2007 Order at 2.) Thereafter, DSND served the Attachment Order on, *inter alia*, the Bank of New York and Wachovia Bank. (*See* Def.'s Reply Ex. B; Pl.'s Opp. at 9.)

On January 30, 2007 and March 8, 2007, two attachments totaling $2,735,643.80 were made by the Bank of New York. (*See* Def.'s Reply Ex. B.) On February 26, 2007, two additional attachments totaling $3,000,000 were made by Wachovia. (*See id.*) The Bank of New York released $434,062.36 in March, 2007, resulting in the current amount under attachment totaling $5,301,581.44. (*See id.*)

Following the attachments, Oceanografia filed an answer to the verified complaint wherein it admitted that it entered into an agreement with DSND with respect to the *Fennica*, but asserted that the sums due and owing under that charter party have been "substantially paid." (*See* Def.'s Answer and Counterclaim ¶¶ 6, 12.) Furthermore, Oceanografia denied entering into a charter party with respect to the *Botnica*, and contended instead that "DSND fraudulently induced [Oceanografia] to pay substantial sums of money, including without limitation a $1,000,000 mobilization fee, by negligently and/or intentionally misrepresenting that the vessel was available for the job when in fact it wasn't." (*Id.* ¶ 10.) Finally, Oceanografia asserted a counterclaim alleging that DSND (1) "negligently and intentionally" misrepresented that it had obtained permission from the vessel's owner to keep the vessel in Mexico, and (2) subsequently withdrew the *Botnica* from service, breaching the charter party, if any, that existed. (*Id.* ¶¶ 4, 6–7.) As part of its counterclaim, Oceanografia also alleged that DSND committed criminal fraud under Mexican law. (*Id.* at 7.) Oceanografia asserted damages in excess of $2,000,000 resulting from the allegedly premature withdrawal of the *Botnica*. (*Id.* ¶¶ 9–10.)

Oceanografia now moves to vacate the attachment, or, in the alternative, to require DSND to post countersecurity in the amount of $3,000,000 based on the counterclaim. DSND has cross-moved for an order directing that a portion of defendant's attached funds be awarded to plaintiff in satisfaction of the orders from the High Court and the Tribunal, which awarded costs to plaintiff in connection with defendant's unsuccessful jurisdictional challenge in the London arbitration and the subsequent appeal. (*See* Pl.'s Opp. at 21–23; June 19, 2008 Letter from Peter J. Gutowski to the Court ("June 19 Letter") at 1–3.)

complete, and a decision on the merits is imminent. (*See* Transcript of June 25, 2008 Oral Argument ("Tr.") at 70.)

2. This case was reassigned to the undersigned on September 4, 2007.

The Court heard oral argument on all of the motions on June 25, 2008.[3]

## II. DISCUSSION

### A. Defendant's Motion to Vacate the Attachment

#### 1. Legal Standard

To obtain a maritime attachment, a plaintiff must comply with Supplemental Rule B of the Federal Rules of Civil Procedure, which states in relevant part:

> If a defendant is not found within the district, ... a verified complaint may contain a prayer for process to attach the defendant's tangible or intangible personal property—up to the amount sued for—in the hands of garnishees named in the process.... The court must review the complaint and affidavit and, if the conditions of this Rule B appear to exist, enter an order so stating and authorizing process of attachment and garnishment. The clerk may issue supplemental process enforcing the court's order upon application without further court order.

Fed.R.Civ.P. Supp. R. B(1)(a)-(b).

 Supplemental Rule E(4)(f) allows any person whose property has been attached pursuant to Rule B an opportunity to appear before a district court to contest the attachment. Fed.R.Civ.P. Supp. R. E(4)(f). "Rule E(4)(f) clearly places the burden on the plaintiff to show that an attachment was properly ordered and complied with the requirements of Rules B and E." *Aqua Stoli Shipping Ltd. v. Gardner Smith Pty Ltd.*, 460 F.3d 434, 445 n. 5 (2d Cir.2006). To sustain an attachment, a plaintiff must show that it has fulfilled the "filing and service requirements of Rules B and E" and that "1) it has a valid *prima facie* admiralty claim against the defendant; 2) the defendant cannot be found within the district; 3) the defendant's property may be found within the district; and 4) there is no statutory or maritime law bar to the attachment." *Id.* at 445. If a plaintiff fails to demonstrate that these requirements have been met, the court must vacate the attachment. *Id.* Otherwise, an order of attachment may only be vacated "in certain limited circumstances," including where "1) the defendant is subject to suit in a convenient adjacent jurisdiction; 2) the plaintiff could obtain *in personam* jurisdiction over the defendant in the district where the plaintiff is located; or 3) the plaintiff has already obtained sufficient security for the potential judgment, by attachment or otherwise." *Id.* at 444–45.

#### 2. Analysis

As noted above, plaintiff bears the burden of sustaining the attachment by fulfilling the filing and service requirements of Rules B and E, and by meeting the four elements of the *Aqua Stoli* test. *Id.* at 445. Defendant does not contest that plaintiff has a valid *prima facie* admiralty claim against the defendant pursuant to the first element of the *Aqua Stoli* test. *See id.* at 445. However, defendant argues that the attachment should nevertheless be vacated because (1) the electronic funds transfers ("EFTs") attached by plaintiff do not constitute "property" under New York state law (*see id.* at 11–15); (2) the attachment was barred pursuant to the Second Circuit's rule against attaching after-acquired property (*see* Def.'s Mem. at

---

**3.** The Court is in receipt of two letters—one from defendant dated June 30, 2008, and one from plaintiff dated July 9, 2008—which offer unsolicited supplemental briefing on the issues previously addressed at oral argument.

Despite the fact that the Court did not give the parties permission to make those submissions, the Court has considered the arguments addressed therein.

10–11); and (3) the attachment of the EFTs violated defendant's substantive due process rights (*see* Def.'s Reply at 9). For the reasons that follow, the Court rejects each of these arguments.

a. The EFTs Were Properly Attached

■ Defendant first argues that the attachment should be vacated because, under New York state law, "neither the originator nor the beneficiary has a property interest in an EFT while at an intermediary bank." (Def.'s Mem. at 13.) Defendant argues that because Rule B sanctions only the attachment of a defendant's "tangible or intangible property," the attachments at issue here were improper. (*See id.* at 11–13.)

The argument put forth by defendant was squarely addressed by the Second Circuit in *Winter Storm Shipping Ltd. v. TPI,* 310 F.3d 263 (2d Cir.2002).[4] In that case, the court considered whether "[EFTs] in the hands of an intermediary bank may be attached pursuant to Admiralty Rule B(1)(a)." *Winter Storm,* 310 F.3d at 278. While the court considered the issue to be one of first impression in the Second Circuit as it related to claims in admiralty, the court engaged in an extensive review of *United States v. Daccarett,* 6 F.3d 37 (2d Cir.1993), in which it found "significant guidance." *Winter Storm,* 310 F.3d at 276–77. The *Winter Storm* court agreed with the *Daccarett* court's conclusion that " 'an EFT while it takes the form of a bank credit at an intermediary bank is clearly a seizable *res* under the forfeiture statutes,' " and found that "[t]here is no principled basis for applying a different analysis or arriving at a different conclusion in the instant case." *Id.* at 278 (quoting *Daccarett,* 6 F.3d at 55). Accordingly, the Court found that an EFT in the hands

of an intermediary bank may be attached pursuant to Rule B. *Id.* at 278.

Courts addressing the issue since *Winter Storm* have applied the *Winter Storm* court's holding that EFTs constitute attachable property. *See, e.g., Aqua Stoli,* 460 F.3d at 436 ("Under the law of this circuit, EFTs to or from a party are attachable by a court as they pass through banks located in that court's jurisdiction"); *Padre Shipping, Inc. v. Yong He Shipping,* 553 F.Supp.2d 328, 333–34 (S.D.N.Y. 2008); *Consub Delaware LLC v. Schahin Engenharia Limitada,* 476 F.Supp.2d 305, 311 (S.D.N.Y.2007) ("Despite the fact that the Second Circuit—in *dicta*—questioned the correctness of [*Winter Storm,*] it did not overrule *Winter Storm.* To the contrary, the *Aqua Stoli* court relied on *Winter Storm* as support for its statement that 'EFTs to or from a party are attachable by a court as they pass through banks located in that court's jurisdiction.' ") (quoting *Aqua Stoli,* 460 F.3d at 436); *Ronda Ship Mgmt. Inc. v. Doha Asian Games Org. Comm.,* 511 F.Supp.2d 399, 404–05 (S.D.N.Y.2007); *Mediterranea Di Navigazione Spa v. Int'l Petrochemical Group S.A.,* No. 06 Civ. 6700(JGK), 2007 WL 1434985, at *2 (S.D.N.Y. May 15, 2007). In light of this precedent, plaintiff's argument that EFTs are not attachable as property under Rule B is untenable.

Accordingly, defendant's motion to vacate the attachment on the grounds that EFTs do not constitute attachable property is denied.

b. The Attached Funds Do Not Constitute "After Acquired" Property

■ Defendant also argues that the attachment of its funds was improper on the

---

**4.** Defendant concedes that this argument "conflicts in part with the Second Circuit's holding in *Winter Storm*" but asserts that

"this is accordingly an argument for the [Second Circuit], should an appeal eventuate in this matter." (*Id.* at 12 n. 5.)

ground that Second Circuit precedent—namely *Reibor International Limited v. Cargo Carriers (KACZ–CO.) Limited,* 759 F.2d 262 (2d Cir.1985) and *ContiChem LPG v. Parsons Shipping Co., Ltd.,* 229 F.3d 426 (2d Cir.2000)—prohibits the attachment of "after acquired" property, or property that was not in the garnishee's possession at the time of service, and arrived in the possession of the garnishee only *after* service of process. Specifically, defendant asserts that Judge Karas' order, which contained the continuous service provision described above, was improper and contrary to the holdings in *Reibor* and *Conti–Chem.* (*See* Def.'s Mem. at 10–11.)

In *Reibor,* the plaintiff sought to attach defendant's funds as they were transferred through a New York bank; however, each process of attachment and garnishment was served either before the garnishee bank received funds or after it had transferred them. 759 F.2d at 263–64. The district court denied plaintiff's motion for the posting of security, finding that an attachment was never validly made because "at the time process was allegedly served on both garnishees, neither had in its possession any property of the defendant...." *Reibor Int'l Ltd. v. Cargo Carriers (Kacz–Co.), Ltd.,* No. 83 Div. 793(CES), 1984 WL 1467, at *2 (S.D.N.Y. July 24, 1984). The Second Circuit affirmed the district court's finding that no attachment was made, rejecting plaintiff's argument that "a Rule B attachment is and stays valid until the garnishee answers, whether or not the garnishee possesses the property at the time of service." *Reibor,* 759 F.2d at 265. Given the absence of any authority in federal admiralty law, the court looked to New York state law, holding that "[a] levy by service of an order of attachment upon a person other than the defendant is effective only if, *at the time of service,* ... such person is in the possession or custody of such property in which

such person knows or has reason to believe defendant has an interest ..." 759 F.2d at 266 (emphasis in original) (quoting N.Y. Civ. Prac. Law § 6214(b) (McKinney 1985)).

In *ContiChem,* the Second Circuit again recognized the "well-established prohibition against maritime attachments of after-acquired property." 229 F.3d at 433 (citing *Reibor,* 759 F.2d at 268). In that case, the court affirmed the district court's vacatur of an order of attachment, finding that plaintiff had "improperly attempted to circumvent the rule against attachment of property not yet in [garnishee's] possession, *see Reibor,* 759 F.2d at 268, by using a temporary restraining order that the court subsequently found had been issued in error to prohibit the transfer of [defendant's] funds out of the district ..." *Id.* at 434.

Plaintiff responds to defendant's argument by citing to recent decisions in this District holding that the prohibition on attaching "after acquired" property is not violated where there is an order permitting "continuing service," or where the garnishee agrees that service will be deemed good and ongoing for a reasonable period of time. (*See* Pl.'s Opp. at 9–15 (citing *Navalmar (U.K.) Ltd. v. Welspun Gujarat Stahl Rohren, Ltd.,* 485 F.Supp.2d 399 (S.D.N.Y.2007); *Ullises Shipping Corp. v. FAL Shipping Co. Ltd.,* 415 F.Supp.2d 318 (S.D.N.Y.2006), *overruled on other grounds by Aqua Stoli,* 460 F.3d at 446; and *Ythan Ltd. v. Americas Bulk Transport Ltd.,* 336 F.Supp.2d 305 (S.D.N.Y.2004)).)

In *Ythan,* the district court granted plaintiff's application for an *ex parte* order of attachment, which specifically included in its definition of "property" EFTs in the possession or control of Citibank. *See* 336 F.Supp.2d at 307. Plaintiff thereafter con-

tacted Citibank to discuss the terms of service, and Citibank agreed to accept service of the order by fax, and to "treat that service as being effective throughout the remainder of that particular business day so as to avoid the 'absurdity' of having to continuously accept service of process throughout the day." *Id.* The order was subsequently faxed to Citibank on four separate days, and Citibank proceeded to attach six separate EFTs. *Id.* The defendant subsequently moved to vacate the attachment on the grounds that no *res* existed because continuing service throughout the day was improper. *Id.*

The Honorable P. Kevin Castel, District Judge, found that while "defendant has a direct interest in the question of whether jurisdiction over his interest in property has been acquired," "that does not give him a seat at the table on all issues relating to the service of process." *Id.* The court went on to deny the motion, holding that service of the order was valid given Citibank's consent to treat service as effective from receipt of the fax in the morning until the close of business that day, and thus the *res* was properly attached at the time it passed through Citibank. *Id.* at 308.

In *Navalmar,* the plaintiff likewise secured a writ of attachment and served it on Citibank, which subsequently attached funds that came into Citibank's possession *after* service of the writ was made. 485 F.Supp.2d at 409–10. The Honorable Alvin K. Hellerstein, District Judge, held that "plaintiff may not *compel* a garnishee to hold service of process for maritime attachment effective until such time as a *res* comes into the garnishee's possession or the garnishee answers, but the garnishee may agree to do so, and the garnishee's procedures will not vitiate an attachment as long as they are reasonable." *Id.* at 410 (emphasis in original).

Finally, in *Ullises,* the district court again authorized a writ of attachment, and the plaintiff served that writ on several garnishee banks. *See Ullises,* 415 F.Supp.2d at 321. However, unlike *Ythan* and *Navalmar,* in which continuous service was agreed upon by the garnishee bank, *Ullises* involved a court order which expressly directed that "service on any garnishee . . . is deemed effective continuous service throughout the day from the time of such service through the opening of the garnishee's business the next business day." *Id.* at 328 (citations and internal quotation marks omitted). There, citing *Ythan,* the Honorable Shira A. Scheindlin, District Judge, held that the banks' acceptance of service as continuing throughout the day did not invalidate the attachment of funds that came into the banks subsequent to the initial service of the order that day. *Id.* at 328. In particular, the court noted that "[i]t is not relevant that in *Ythan,* the garnishees agreed that service would be effective for the entire day and that here, the Court ordered the service to be effective throughout the day, without any express agreement from the garnishees." *Id.* Rejecting the argument that the continuous service provision violated the after-acquired property rule enunciated in *Reibor,* Judge Scheindlin held that "[s]ome provision for continuous service is required to allow attachment of EFTs without significant disruption to financial institutions." *Id.*

In light of these cases, the Court finds that the EFTs attached pursuant to the Court's order were validly attached. As discussed above, the Second Circuit held in *Winter Storm* that EFT funds constitute attachable property. 310 F.3d at 278. Thus, given that "[a]n EFT may be in the possession of a financial institution for only a very short period of time," *Ullises,* 415 F.Supp.2d at 324, and may move through

the bank "almost instantaneously," *Winter Storm*, 310 F.3d at 278, it follows that it would be virtually impossible for plaintiffs to attach EFTs unless garnishee banks are permitted to accept continuous service in the manner carried out here. *See Winter Storm*, 310 F.3d at 274 n. 7 ("Professor Jarvis, in his discussion of *Reibor*, observes that '[s]ince the plaintiff normally will not know when the funds will reach the bank, and since the bank may have instructions from the defendant to move the funds to another bank as soon as they arrive, the plaintiff in such a case has no choice but to have process served on the bank in a continuous manner.'") (quoting Robert M. Jarvis, *An Introduction to Maritime Attachment Practice Under Rule B*, 20 Journal of Maritime Law and Commerce, No 4 (October 1989) at 536).

Clearly, the goal of the continuous service provision contained in the order signed by Judge Karas in this case and by Judge Scheindlin in *Ullises* was *not* to undermine the Second Circuit's prohibition on the attachment of after-acquired property announced in *Reibor*. Rather, the continuous service provision was "intended to avoid the absurdity, security problems, and inconvenience of requiring the garnishee banks to accept service repeatedly throughout the day." *Ullises*, 415 F.Supp.2d at 328. Indeed, the absence of such a continuing service provision—either by court order or by consent from the garnishee—would inevitably result in the posting of lawyers and/or process servers at bank offices around the clock in an attempt to capture EFTs at the precise moment of their arrival. Defendant's narrow reading of *Reibor* would, in effect, overrule the Second Circuit's later holding in *Winter Storm*—something the Second Circuit expressly declined to do in *Aqua Stoli*—by making it virtually impossible to attach EFTs in Rule B cases.

Like Judge Scheindlin, this Court finds that "[n]othing in the Admiralty Rules prohibits this Court from issuing such an order to provide for a practical means of service. . . ." *Id.* Accordingly, the Court follows the decisions of other courts in this District and finds that the attachment in this case did not violate the prohibition on after-acquired property articulated in *Reibor* and *ContiChem*. Defendant's motion to vacate the attachment on this ground is thus denied.

c. Defendant's Substantive Due Process Rights Have Not Been Violated

In defendant's reply papers, defendant raises for the first time its argument that the attachments at issue here violated substantive due process guarantees. (*See* Def.'s Reply at 9.) Defendant cites the recently-decided case of *Porina v. Marward Shipping Co.*, 521 F.3d 122 (2d Cir. 2008) as support for the proposition that, where a shipowner's contacts with the United States were unintentional, those contacts could not serve as the basis for invoking personal jurisdiction over the shipowner. (*See* Def.'s Reply at 9–10.)

■ Generally, "new arguments may not be made in a reply brief." *Ernst Haas Studio, Inc. v. Palm Press, Inc.*, 164 F.3d 110, 112 (2d Cir.1999) (citing *Knipe v. Skinner*, 999 F.2d 708, 711 (2d Cir.1993)). While defendant asserts that the *Porina* case constitutes "new" authority for the proposition it advances, defendant was not precluded from making a substantive due process argument in its moving papers and cannot now raise it for the first time in its reply papers.

■ However, even assuming *arguendo* that defendant's argument was properly before the Court, defendant's argument is without merit. *Porina* involved neither a maritime attachment nor the application of Rule B, and is thus entirely distinguishable

from this case on both legal and factual grounds, and does not support a finding that the attachments in this case violated defendant's substantive due process rights. By contrast, this case is governed by Rule B, which "is a jurisdictional provision intended to provide district courts with *quasi-in-rem* jurisdiction over a maritime defendant which is not 'found' within the district because it is not geographically located there and the district court does not otherwise have personal jurisdiction over it." *SMT Shipmgmt. & Transport Ltd. v. Maritima Ordaz C.A.*, No. 00 Civ. 5789(GEL), 2001 WL 930837, at *2 (S.D.N.Y. Aug. 15, 2001); *see also Oilmar Co. Ltd., Panama v. Energy Transport, Ltd.*, No. 03 Civ. 1121(CFD), 2003 WL 21976599, at *1 (D.Conn. Aug. 18, 2003). The Second Circuit held in *Winter Storm* that the attachment of EFTs pursuant to Rule B satisfies the due process requirements of the Fifth Amendment. *See Winter Storm*, 310 F.3d at 273 ("We regard the due process safeguards added by the 1985 amendments to Admiralty Rules B and E as sufficient to satisfy constitutional requirements, and discern in the due process clause no basis for rendering the traditional remedy of maritime attachment inapplicable to electronic transfers of funds familiar to those engaged in international trade and increasingly used by them."). Additionally, one court in this District has already rejected the argument articulated here by defendant, finding that *Porina* is distinguishable from, and inapplicable to, an action arising under Rule B. *See Seatrek Trans Pte Ltd. v. Regalindo Res. Pte Ltd.*, No. 08 Civ. 551(LAP), 2008 WL 1956745, at *1–2 (S.D.N.Y. Apr. 30, 2008) (distinguishing *Porina* as interpreting personal jurisdiction requirements pursuant to Rule 4(k)(2) rather than *quasi in rem*

jurisdiction pursuant to Rule B). Accordingly, defendant's motion to vacate the attachment on the ground that the attachment violated defendant's substantive due process rights is denied.

\* \* \*

Based on the foregoing, the Court finds that the filing and service requirements of Rules B and E were met, as were the four prongs of the *Aqua Stoli* test. Accordingly, the attachment was properly issued and defendant's motion to vacate the attachment is denied.

### B. Defendant's Motion for Countersecurity

Defendant also moves, in the event the Court denies defendant's request to vacate the attachment, for an order requiring plaintiff to post countersecurity. Defendant argues that its assertion of a non-frivolous counterclaim in this case, based on its filing of a criminal complaint in Mexico, entitles it to counter-security under Rule E(7) in the amount of $3,000,000.[5] (*See* Def.'s Mem. at 15–20.)

Plaintiff opposes the motion for countersecurity on several grounds. Plaintiff first contends that the Mexican "counter-claims" concerning plaintiff's alleged wrongful conduct relating to the *Botnica* are criminal proceedings that do not constitute "counterclaims" under Rule E(7), and that defendant abandoned any counterclaims it may have had in the London arbitration, the agreed-upon forum for disputes in this matter. (*See* Pl.'s Opp. at 17–18.) Plaintiff also asserts that defendant's counterclaims in this action are frivolous, and that countersecurity is thus unwarranted. (*See id.* at 20–21.)

---

5. Defendant conceded at oral argument that the counterclaims in the London arbitration have been withdrawn. (*See* Tr. at 40.)

For the reasons that follow, defendant's motion for an order requiring plaintiff to post countersecurity is denied.

### 1. Legal Standard

Rule E(7) governs the posting of security on counterclaims:

> When a person who has given security for damages in the original action asserts a counterclaim that arises from the transaction or occurrence that is the subject of the original action, a plaintiff for whose benefit the security has been given must give security for damages demanded in the counterclaim unless the court for cause shown, directs otherwise.

Fed.R.Civ.P. Supp. R. E(7)(a). "Although this Rule initially appears to make the posting of countersecurity mandatory whenever its conditions are satisfied, the final clause of the quoted language makes clear that the trial court possesses broad discretion in deciding whether to order countersecurity under such conditions." *Result Shipping Co., Ltd. v. Ferruzzi Trading USA Inc.*, 56 F.3d 394, 399 (2d Cir.1995) (citations omitted); *see also Front Carriers Ltd. v. Transfield ER Cape Ltd.*, No. 07 Civ. 6333(RJS), 2007 WL 4115992, at *1–2 (S.D.N.Y. Nov. 19, 2007).

■■ "In deciding whether cause has been shown to justify a denial of countersecurity, a court should be guided by the broad purposes of the rule, which is intended 'to place the parties on an equality as regards security,' but not 'to impose burdensome costs on a plaintiff that might prevent it from bringing suit.'" *Voyager Shipholding*, 539 F.Supp.2d at 690 (quoting *Result Shipping*, 56 F.3d at 399–400). Courts are not to impose countersecurity for "totally frivolous" counterclaims, *Rosemary v. Jaldhi Overseas Pte Ltd.*, 531 F.Supp.2d 586, 589 (S.D.N.Y.2008), or claims "aimed primarily at thwarting [plaintiff's] prosecution of the original action," *North Offshore*, 2007 WL 4233014, at

*4. *See also Voyager Shipholding*, 539 F.Supp.2d at 691; *Front Carriers*, 2007 WL 4115992, at *2; *Finecom Shipping Ltd. v. Multi Trade Enterp. AG*, No. 05 Civ. 6695(GEL), 2005 WL 2838611, at *1 (S.D.N.Y. Oct. 25, 2005). "In balancing these policies, the trial court 'must weigh the importance of the security interest giving rise to the initial seizure, and the burden of posting countersecurity, against the potential injustice of requiring the defendant-counterclaimant to post security without affording reciprocal protection.'" *Result Shipping*, 56 F.3d at 400 (quoting *Titan Navigation, Inc. v. Timsco, Inc.*, 808 F.2d 400, 404 (5th Cir.1987)).

Because the language of Rule E is identical to that of Rule 13(a)(1)(A) of the Federal Rules of Civil Procedure, courts have applied the test for compulsory counterclaims under Rule 13 in determining whether the counterclaim "arises out of the same transaction or occurrence" for purposes of requiring countersecurity. *See Voyager Shipholding Corp. v. Hanjin Shipping Co., Ltd.*, 539 F.Supp.2d 688, 691 (S.D.N.Y.2008); *Seaplus Line Co. Ltd. v. Bulkhandling Handymax AS*, 409 F.Supp.2d 316, 324 (S.D.N.Y.2005); *Sea-Terminals, Inc. v. Independent Container Lines, Ltd.*, No. 89 Civ. 6931(MBM), 1990 WL 130766, at *2 (S.D.N.Y. Sept. 4, 1990). The Second Circuit has "taken a 'broad view' of Rule 13, based on whether there is a 'logical relationship between the claim and the counterclaim' such that 'considerations of judicial economy and fairness dictate that all the issues be resolved in one lawsuit.'" *Voyager Shipholding*, 539 F.Supp.2d at 691 (citing *United States v. Aquavella*, 615 F.2d 12, 22 (2d Cir.1980)) (additional citation and internal quotation marks omitted). Thus, to the extent that defendant's counterclaims "arise out of the same transaction or occurrence" as plaintiff's claims, they must have been brought

as compulsory counterclaims for the Court to consider imposing countersecurity. *See North Offshore AS v. Rolv Berg Drive AS,* No. 07 Civ. 3095(SHS), 2007 WL 4233014, at *4 (S.D.N.Y. Nov. 29, 2007); *Sea–Terminals,* 1990 WL 130766, at *2 ("Supplemental Rule E(7) is identical to Fed. R.Civ.P. 13(a), which permits counter-security only for compulsory counterclaims.").

### 2. Analysis

■ The Court concludes that defendant is not entitled to countersecurity. Neither plaintiff nor defendant has expressed an intention—or indeed, an ability—to litigate the underlying claims in this District. Rather, plaintiff initiated arbitration proceedings in London relating to both the *Botnica* and the *Fennica* charter parties in October 2002, which were consolidated in November 2004. (*See* Stockwood Decl. ¶¶ 14–15.) Plaintiff asserts, and defendant does not contest, that defendant participated in these consolidated arbitration proceedings. (*See id.* ¶¶ 15–55.) Indeed, after unsuccessfully contesting the jurisdiction of the London arbitration panel, defendant filed counterclaims in the arbitration in January 2007 and subsequently amended those counterclaims. (*See id.* ¶¶ 41–55.) Defendant has since withdrawn its counterclaims in the London arbitration (*see id.* ¶ 62; Tr. at 51–52), with the withdrawal occurring only *after* defendant filed the instant motion to vacate the attachment. Defendant concedes that its motion for countersecurity is thus entirely based upon the action in Mexico, which defendant further concedes is a *criminal* proceeding in which defendant is not a party. (*See* Tr. at 40–48; *see also* Olvera Supp. Decl. at 1–6 (discussing application of Mexican criminal law).)

The Court finds that the filing of the criminal complaint in Mexico simply does not merit the imposition of countersecurity as contemplated by Rule E(7). The mere fact that Mexico's criminal law—like many criminal statutes in the United States—provides for restitution to victims of the underlying criminal conduct does not somehow transform a criminal investigation and possible prosecution brought by Mexican prosecutors into an action recognizable as a claim or counterclaim under Rule 13 or Supplemental Rule E of the Federal Rules of Civil Procedure. Were defendant bringing suit in Mexico in a civil proceeding in which defendant was a party, or pursuing its previously-asserted counterclaims in the London arbitration, the Court might reach a different conclusion. However, defendant's filing of a criminal complaint in Mexico, leaving the Attorney General of the State of Tabasco to investigate the conduct at issue, and, ultimately, with the discretion to pursue, or decline, a criminal prosecution against plaintiff, is simply not an action in which defendant is pursuing the civil "counterclaim" asserted in this case. As such, the Court finds that "cause" exists under Rule E(7) for the Court to decline to exercise its discretion with respect to countersecurity. Put another way, the Court concludes that there is no need to place defendant on equal footing with plaintiff or institute reciprocal protections where defendant has abandoned the counterclaim by refusing to pursue it in the London arbitration or any other civil arena. *See Voyager Shipholding,* 539 F.Supp.2d at 690 ("In deciding whether cause has been shown to justify a denial of countersecurity, a court should be guided by the broad purposes of the rule, which is intended 'to place the parties on an equality as regards security,' but not 'to impose burdensome costs on a plaintiff that might prevent it from bringing suit.'") (quoting *Result Shipping,* 56 F.3d at 399–400); *Finecom Shipping,* 2005 WL 2838611, at *1 ("[T]he core purpose of the countersecurity rule is to place the parties on an even footing ....") (citing *Wash.-S.*

*Nav. Co. v. Balt. & Phila. Steamboat Co.,* 263 U.S. 629, 638–39, 44 S.Ct. 220, 68 L.Ed. 480 (1924)).

Accordingly, defendant's motion for countersecurity is denied.

### C. Plaintiff's Motion for an Award of Costs

Plaintiff cross-moves for an order directing that a portion of defendant's attached funds be awarded to plaintiff in satisfaction of the orders from the English High Court and the Tribunal, which awarded costs to plaintiff in connection with defendant's unsuccessful jurisdictional challenge in the London arbitration. (*See* Pl.'s Opp. at 21–23; June 19 Letter at 1–3.) Defendant originally opposed the cross-motion, arguing that such an award would be premature given defendant's right to appeal in the event that the Court refuses to vacate the attachment. (*See* Def.'s Reply at 13–15.) However, at oral argument, defendant did not oppose entry of an order enforcing the awards of the English courts, agreeing that there was no impediment to the entry of such an order. (*See* Tr. at 93.)

Accordingly, plaintiff's motion for an order directing that a portion of defendant's attached funds be awarded to plaintiff in satisfaction of the orders from the English High Court and the London Tribunal is granted. Within ten days of this Order, plaintiff shall submit to the Court (1) a proposed order directing that the orders of the English courts be enforced against the funds under attachment; and (2) an affidavit in support of the proposed order that sets forth the exact amounts to be awarded to plaintiff and enforced against the

funds under assessments of costs by the English High Court and the Tribunal.[6]

### III. CONCLUSION

For the reasons stated above, defendant's motion to vacate the attachment is DENIED. Defendant's motion for countersecurity is DENIED. Plaintiff's cross-motion for an order directing that a portion of defendant's attached funds be awarded to plaintiff in satisfaction of the orders from the English High Court and the London Tribunal is GRANTED. The Clerk of the Court is respectfully directed to terminate the motions located at document numbers 14, 15 and 26.

SO ORDERED.

---

**6.** The Court is receipt of a letter from plaintiff dated July 24, 2008 in which plaintiff states that a decision from the London Tribunal is imminent and that plaintiff is "happy to await the issuance of the final order before dealing with the enforcement aspects." The Court will entertain any future application by plaintiff to enforce any future award of the London Tribunal, but in the interim, declines to stay entry of this order.